Jeffrey MAY, individually; Jean Ross, as natural parent of Damon Ross, an infant, and Jean Ross, individually; Bonnie Schorske, as natural parent of Mark Tulloss, an infant, and Bonnie Schorske, individually; Brenda Butler, as natural parent of Cary Butler, an infant, and Brenda Butler, individually; Gary Drew individually, Plaintiffs,

v.

Dr. Saul COOPERMAN, Commissioner of the Department of Education; New Jersey Department of Education; Edison Township Board of Education; Old Bridge Township Board of Education, Defendants.

and

Alan J. Karcher as Speaker of the New Jersey General Assembly; the New Jersey General Assembly; Carmen A. Orechio as President of the New Jersey Senate and the New Jersey Senate, Defendants-Intervenors.

Civ. A. No. 83–89.

United States District Court, D. New Jersey.

Oct. 24, 1983.

**1562**

Pellettieri, Rabstein & Altman by Richard M. Altman, Anne P. McHugh, Trenton, N.J., for plaintiffs.

Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney by William W. Robertson, Ralph J. Marra, Jr., Robert P. Zoller, Newark, N.J., for Alan J. Karcher and Carmen A. Orechio.

Marinari & Farkas by Lawrence T. Marinari, Trenton, N.J., for New Jersey General Assembly and New Jersey Senate.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Jaynee LaVecchia, Deputy Atty. Gen., Trenton, N.J., for Dr. Saul Cooperman, Com'r of Educ. and Dept. of Educ.

R. Joseph Ferenczi, Edison, N.J., for Edison Tp. Bd. of Educ.

DEBEVOISE, District Judge.

This is an action for declaratory and injunctive relief brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202. Plaintiffs seek to have declared unconstitutional a State statute, namely, New Jersey P.L. 1982, Ch. 205 which provides that:

1. Principals and teachers in each public elementary and secondary school of each school district in this State shall permit students to observe a 1 minute period of silence to be used solely at the discretion of the individual student, before the opening exercises of each school day for quiet and private contemplation or introspection.

2. This act shall take effect immediately.

Plaintiffs are public school children and parents of such children who either are not religious and view the minute of silence as an enforced religious observance or else are religious and oppose required participation in this particular observance. One plaintiff, Jeffrey May, is a teacher in the Edison Township school who declined to conduct a minute of silence in his classroom on the ground that it is a religious observance and who was threatened with discipline for this failure.

Defendants are Saul Cooperman, Commissioner of New Jersey's Department of Education which is responsible for implementing the minute of silence bill, the Edison Township Board of Education and the Old Bridge Township Board of Education.

The statute became effective on December 16, 1982 when the New Jersey State Senate overrode the Governor's veto, the Assembly having overridden the veto on December 13. By reason of the approaching Christmas recess the full effect of the statute was not felt until January 1983, when the public schools reopened.

This action was filed on January 10, at which time I issued an order temporarily restraining implementation of the statute.

Subsequently the parties and the New Jersey Assembly and New Jersey Senate, which intervened as defendants, agreed to an extension of the temporary restraint until the trial of the case, thus in effect converting the temporary restraining order into a preliminary injunction.

The original defendants did not take an active role in the defense of the case. This inactivity flowed, no doubt, from the fact that the State's Governor and Attorney General had concluded that the statute violated the United States Constitution and that they could not in good faith defend it. However, the intervening defendants vigorously contested the action both during pretrial discovery proceedings and at the trial itself.

The trial commenced on September 13, 1983. Both sides produced extraordinarily useful witnesses. Each witness was articulate and effectively testified as to a significant aspect of the case. The witnesses viewed the statute, its purpose and effect from very different perspectives. Each witness held strong views concerning the educational and/or religious implications of the statute. All of their views were essential for an understanding of the issues and contributed significantly to the resolution of these issues.

### The Facts

In the early 1960's the United States Supreme Court held that school-sponsored prayer and Bible reading in the public schools are unconstitutional. *School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). These decisions required modification of the exercises which traditionally had been conducted in New Jersey's public schools at the start of each day. These exercises typically included reading from the Old Testament and recital of the Lord's Prayer.

There was very substantial opposition to the Supreme Court's decisions, and in many parts of the United States various measures were proposed to change the ruling or evade it. In New Jersey legislation was proposed from time to time with the rather obvious purpose of reintroducing opening prayer in some form in the public schools.

At first such proposed legislation specifically mentioned prayer. For example, A. 146 (1969), which authorized "a brief period of silent prayer or meditation", was vetoed by Governor Hughes who had doubts as to its constitutionality. In 1971 a similar bill (A. 597 (1970)) was vetoed by Governor Cahill on similar grounds.

In 1978 the legislature adopted A. 648 which mandated "a brief period of silent meditation" at the beginning of each day and explicitly disavowed any intent to create a religious exercise. Governor Byrne declined to approve the bill and it failed to become law. He based his decision in part on the bill's possible violation of the Establishment Clause or the Free Exercise Clause of the First Amendment and in part on the lack of any useful purpose of the bill.

In 1980 Assemblyman Zangari introduced A. 2197 which called for a one minute period of silence in each public school during each school day. On May 4, 1981 Governor Byrne returned this bill unsigned on the grounds that it was either unconstitutional or unnecessary.[1]

The statute which is the subject of this case was introduced as Assembly Bill No. 1064 on March 8, 1982. Its principal sponsor was Assemblyman Zangari, who was joined by 54 other members of the Assembly. Assemblyman Zangari had previously introduced three other bills on related subjects: one calling for an amendment to the United States Constitution to permit prayer in public places, including public schools (A. 162 (1980)), another providing for a period of prayer or scripture reading in each school before the beginning of the school day (A.

---

1. It would seem that the minute of silence law under review in this case is the eighteenth in a series of school prayer or moment of silence bills introduced in the New Jersey legislature since 1970. Drakeman, Prayer in the Schools: Is New Jersey's Moment of Silence Law Constitutional? 35 Rut.L.Rev. 341 (1983) (*see* footnote 92 at 356 for a listing of the bills).

2196 (1980)), and still another providing for a one minute period of silence after the beginning of each school day (A. 2197 (1980), referred to above).

The New Jersey legislature does not preserve an official record of its hearings and debates, and consequently this source of information concerning the purpose of legislation is not available.[2] However, several witnesses described some of the legislative committee meetings which they attended by reason of their interest in the Bill.

Joseph Chuman, leader of the Society for Ethical Culture for Bergen County testified in opposition to the Bill before Senator Feldman's Education Committee on June 21, 1982. The hearing on the Bill lasted 1½ to 2 hours. Three committee members, including Senator Feldman, were present. Two representatives of education organizations and a representative of the American Civil Liberties Union spoke against the Bill. Assemblyman Zangari spoke in favor. He argued that it would serve a useful psychological purpose. He pointed out that although he was a Catholic he went to Protestant schools and was encouraged to participate, which never did him any harm. When Chuman spoke to him afterwards Assemblyman Zangari asserted that he would be happy to see verbal prayer and Bible reading in the schools. Asked about the effect on atheists, he stated that they were so few in number their views could be discounted. Mr. Chuman could recall no discussion before the Committee of the educational purposes of the Bill.

Marianne Rhodes, Associate Director of Government Relations of the New Jersey School Board Association, attended a May 17, 1982 hearing of an Assembly Committee and a September 23, 1982 hearing of the Senate Education Committee. She made memoranda of the discussions concerning Bill A. 1064. At the Assembly Committee hearing Assemblyman Zangari stated that the Bill had been reduced to 54 words and that it was important that society get back to deeply embedded religious values. He quoted President Reagan as advocating adoption of a constitutional amendment allowing school prayer.

Ms. Rhodes recorded that at the September 23 Senate hearing Senator Ewing and Assemblyman Zangari spoke for the Bill. In response to Senator Feldman's question why the Bill was necessary since students could pray whenever they wished, Assemblyman Zangari stated that "They [students] publicly won't do it [pray] unless they are directed."

The Rev. Dudley E. Sarfaty is Associate General Secretary of the New Jersey Council of Churches, a group composed of representatives of 15 Protestant denominations. He attended the sessions of the Assembly at which the question of overriding the Governor's veto was debated. He made notes of these sessions. Assemblyman Michael F. Adubato urged that it would be a good thing if the State subsidized parochial education, and the Bill was a step in the right direction. Senator Dumont stated that the kind of ceremony required by the minute of silence Bill would cut down crime and disruption and that the legislature should not be rigid on matters of church and state. Senator Cardinale asserted that "We know what the people want" and asked rhetorically whether the members of the State Senate were the servants of the people or the courts. The only argument which Rev.

2. During the pretrial phase of this case plaintiffs sought to fill the gap left by the absence of a legislative record by taking the depositions of individual legislators and otherwise subjecting them to discovery. I concluded that although the legislative privilege contained in the federal constitution is not available to state legislators and although the legislative privilege contained in the State constitution is not available in § 1983 actions asserting deprivation of federal rights, for general policy reasons the law does not permit individual state legislators to be subjected to discovery in ·civil cases involving the interpretation or validity of state legislation absent very compelling reasons. Such reasons did not exist here. However, I also concluded that the absence of any official record of legislative proceedings and the inability to depose individual legislators created a situation in which it was more likely that otherwise inadmissible sources of information might be admitted into evidence as indicative of legislative intent, e.g., newspaper accounts of proceedings admitted as an exception to the hearsay rule under Evid.R. 803(24).

Sarfaty heard touching on possible educational benefits of the Bill was Senator Dumont's assertion that the minute of silence would cut down crime and disruption.

It is significant what those who opposed the Bill conceived its purposes and effect to be, because in many instances they were among those most directly affected by it.

The Ethical Cultural Society of Bergen County styles itself as a liberal religious organization, the purpose of which is to further respect for the individual. It viewed the Bill as an attempt to return prayer to the public schools in another guise and opposed the Bill in the legislature.

The New Jersey School Board Association is a body created by statute comprised of representatives of 611 school districts in the State. Its purpose is to promote public education in New Jersey and to assist local school boards. In the past, at the direction of a very substantial majority of the delegates from the constituent school boards, it opposed legislative efforts to mandate prayer or silent meditation in the public schools on the ground that the practice had no educational value. A small minority of the Association's delegates opposed the Association's position on the ground that prayer should be returned to the schools. By virtue of the strong stand which the delegates had taken on previous prayer and meditation bills, the Association's directors urged the legislature to defeat Bill No. 1064. The rationale offered for its adoption, the calming effect which a moment of silence would have upon students, was viewed as a pretext for a religious purpose.

The American Baptist Churches of New Jersey, the coordinating body of 235 American Baptist Churches in the State, has consistently opposed the prayer and meditation bills introduced into the New Jersey legislature. It has done this on religious grounds. The mandated silence was viewed as an attempt by the State to impose something having the appearance and nature of a religious observance. At the very heart of the American Baptist faith is the tradition of religious liberty and opposition to any move by the state to intrude into religious affairs. Legislation mandating prayer, meditation

and silence is conceived to be state intrusion into religious matters, the effect of which will be to cheapen and "trivialize" true religion. Significantly some American Baptist pastors and members did not agree with the position taken by their denomination's coordinating body. They did not agree because they viewed the minute of silence Bill as a useful way to bring religion into the schools.

The New Jersey Education Association is a labor organization having 117,000 members working in New Jersey's public schools. Of this number 84,000 are teachers. The organization opposed Assembly Bill 1064, perceiving it to be a back door approach to bringing prayer into the public schools.

Despite the opposition, both the Senate and the Assembly voted to override the Governor's veto of the minute of silence Bill and it became law on December 16, 1982. It was in effect only briefly before the temporary restraining order was issued in this case, but it is instructive to examine the impact which the Bill had in several school districts during the short period when it was being implemented.

The intervenors produced evidence of experiences in the Sayreville school system through the testimony of an elementary school teacher, Evelyn A. Swenson, the testimony of an elementary school principal, John D. Singer, and the tape of a CBS television news broadcast showing interviews of students, a school board member and teachers after implementation of Assembly Bill 1064.

Sayreville is a community having a large number of middle income, blue collar inhabitants and a large number of first and second generation citizens of Central European and Scandinavian ancestry. It also has Black, Asian and Hispanic inhabitants.

For many years the Sayreville public schools had commenced each day with a psalm, the Lord's Prayer, the salute to the flag and a patriotic song. In 1969, following the Supreme Court's school prayer decision, the Sayreville Board of Education adopted a resolution which was designed to give people an opportunity to pray. The

resolution, which was moved by Board member DiPoalo provided:

Approval was granted for a 2 minute meditation period to be instituted in our school system after the salute to the flag in the morning for any child who wants to pray, with the provision that no student be forced to pray if he is unwilling, nor deny any student the right to pray.

From that time on all the Sayreville public schools have commenced the day with opening exercises which culminated in a moment of silence. Soon after adoption of the 1969 resolution it became apparent that two minutes of silence was not feasible and by tacit agreement the period of silence was reduced in practice to 30–45 seconds.

Mrs. Swenson testified that at the outset she explained to students the meaning of meditation as silent, private, serious contemplation or thinking. She instructed her students to close their eyes in order that they would not distract each other. It was an opportunity to pray, but no one was required to do so. Some children sat with their hands clasped. Once or twice she noticed a child crossing himself. No parents or children ever expressed concern about the practice, and Mrs. Swenson viewed the ceremony as a helpful way to start the school day. On other occasions during the day she uses periods of silence for specific purposes. For example in science class she may ask the students to maintain silence and determine how many different sounds they can hear. Or in reading class she may ask the students to imagine a particular person or event.

In 1978 the 1969 resolution was modified by the adoption of Policy 808 specifying procedures for opening exercises. It provided for the salute to the flag as a part of each day's opening exercises and stated that, "Opening exercises may also include the singing of patriotic songs and a moment of silent meditation."

Although the language of Policy 808 differed from the 1969 resolution in that there was no reference to prayer and in that the mandated two minutes of silence was changed to a moment of silence, there was in fact no change in the Sayreville opening exercises after 1978. The effect of the 1978 enactment was simply to ratify the existing practice of reducing the length of the period of silence to 30 to 45 seconds.

The adoption of Assembly Bill 1064 required no change in Sayreville's opening exercises, except that perhaps, literally construed, the Bill would require that the moment of silence come first in the sequence of opening events and that it last for 60 seconds.

The intervenors placed in evidence a tape of a two minute CBS interview of various persons in Sayreville concerning Sayreville's experience with its moment of silence. The interview was conducted on December 17, 1982, the day after the override of the Governor's veto. Children were shown practicing contemplation; a high school student described his experiences going back to fourth grade; a principal stated that the moment of silence created no disciplinary problems and had a salutary effect; School Board member DiPoalo, who had introduced Sayreville's 1969 meditation and prayer resolution, referred to nuclear and other crises facing today's world and opined that "people better do a little praying."

The reaction in Princeton was quite different from that in Sayreville. The school system has 2400–2500 students. Religiously the community is heterogeneous. A majority of the residents are of Catholic or Protestant backgrounds. Fifteen to twenty percent of the population is Jewish. Students from forty countries are in the school system and most of the major religions of the world find adherents among the student body.

The minute of silence Bill was the subject of considerable discussion among at least the high school students. It was generally considered a form of prayer which some students opposed and some approved. One high school student, Denice Fishburne, collected 200 signatures on a petition in opposition to the Bill. Another student collected 100 signatures.

Princeton's Superintendent of Schools, Dr. Paul D. Houston, testified at the trial. He stated that immediately after the over-

ride of the Governor's veto he began receiving telephone calls from parents who did not wish their children to be in class when the minute of silence was observed, as they viewed the exercise as a form of enforced prayer. Principals telephoned him expressing fear that enforcing the statute would cause student disruption and stating that many students and some teachers would not observe the new law. Dr. Houston refrained from implementing the statute until he met with the school board. The board was uniformly opposed to the law, believing it to be unconstitutional as a compulsory religious observance in the public schools. By consensus it was agreed that the statute would not be implemented in the Princeton public schools pending a court determination of its validity. In Dr. Houston's opinion there is no educational justification for requiring that all students be silent at the same time. Moreover, were it to be implemented, arrangements would have to be made to excuse large numbers of students who did not wish to participate. He observed that teachers can and do provide for silent contemplation when it fits in with an educational purpose.

Mark Tulloss, an eighth grade student in Roosevelt, New Jersey, had discussed the Bill in his history class. He and most of his classmates opposed a minute of silence on the ground that it constituted prayer, but after the veto override the principal of his school gave instructions that at the start of each day every student was to observe the minute of silence by standing up, bowing his head and closing his eyes. Tulloss remained silent during these periods, but refused to bow his head or close his eyes. He continued reading. The reaction of his classmates to the exercise was that it was "boring", "stupid".

Paramus is a community of 30,000 people, the Jewish, Protestant and Catholic faiths each being equally represented among the population. Dr. Paul Shelly, Superintendent of the Paramus school system, testified that students and teachers generally perceived the minute of silence Bill as an effort to circumvent the Supreme Court decisions and to reintroduce prayer into the schools. The State Board of Education sent no guidelines to the various school districts after the Bill became effective; it simply distributed a copy of the Bill. There were objections to implementing the Bill in Paramus, and Dr. Shelly simply informed teachers that the law had been passed, without elaborating upon how it should be implemented.

Plaintiff Cary Butler, a 17 year old student in the Hillsborough Township High School did not wish to participate in the moment of silence when the entire school was directed by the principal to sit for the minute of silence and be perfectly quiet and still. It was a matter Cary had discussed at home and he and his family concluded that the enforced minute of silence violated their beliefs. He asked his teacher to leave, and the teacher sent him to the school office for a determination. In the hall another teacher directed him to stand still and be quiet, which he refused to do on the ground that it would be enforced prayer. Cary was charged with insubordination and suspended, but shortly he was permitted to return to classes and leave his homeroom during the minute of silence. This dispensation was not granted to other students, the principal preferring to handle requests on a case-by-case basis.

Plaintiff Gary Drew and his wife are Roman Catholics who have six year old and nine year old daughters in the Old Bridge Township public schools. They object to use of the minute of silence in the schools because they believe religious training and observance should be taught in the home and the church. They do not wish to have their young and impressionable children subjected to whatever practice teachers may employ in implementing what they view as an essentially religious observance. They did not instruct their children to leave their classrooms when the minute of silence was observed, because they were concerned that it would unduly embarrass them.

The pain that such a move would cause a young child is illustrated by the circumstances in which Rita Rothenberg and her family found themselves. Mr. and Mrs. Rothenberg asked their young son Joshua

to decline to participate in the minute of silence on religious grounds. The thought of being separated from the other children so upset Joshua that his parents did not persist in their request that he leave the room during the minute of silence.

Plaintiff Jeffrey May is a high school teacher in the Edison school system. He is an agnostic and views the minute of silence as a form of prayer in which he cannot in good conscience participate.

On December 22, 1982 he and all other faculty members received a memorandum from the principal of his high school. The memorandum directed all faculty members and students to participate in a minute of silence as directed by the State Legislature. Mr. May informed his principal that he could not and would not participate because he views the law to be unconstitutional and because it violated his conscience and personal philosophical beliefs. He was nevertheless directed to take part. He refused to do so and was threatened with disciplinary action.

The foregoing represent types of reactions in the public schools in New Jersey after Bill 1064 became effective.

Dr. Calvin Thompson, a psychologist, testified for the intervenors. He had conducted a study in the Las Cruces, New Mexico Public School District of the public perception of the moment of silence law in effect in that District. The District has 14,000 school children. Its population is largely middle class with approximately 50% of the population being of Hispanic origin and approximately 50% being "Anglo". There is a small number of Black and Indian inhabitants. The population is predominantly Christian—Catholic and Protestant—with a lesser number of Jewish inhabitants.

Las Cruces' moment of silence law is described in *Duffy v. Las Cruces Pub. Schools,* 557 F.Supp. 1013 (D.N.M.1983). Dr. Thompson studied the effect of the practice

by televising a number of classrooms before, during and after the moment of silence, by watching the period of silence and by conducting structured interviews with students. On the basis of his study Dr. Thompson concluded that most persons viewed the moment of silence as simply silence and not as prayer. He concluded that it served as a transitional tool separating outside activities from school work and that it was a moment which could be used for meditation or prayer. Some of the students who were interviewed stated that they used the moment for prayer. In any given observation he made, from 0 to 20% of the students assumed positions which could be interpreted as having the probability of being a religious act.[3] Dr. Thompson was of the opinion that the public perception of the moment of silence in New Jersey would be similar to the perception in New Mexico. Dr. Thompson provided interesting data, but I think care must be exercised in generalizing on the basis of it. There are major differences between New Jersey and New Mexico. More important, there are major differences between the many communities in New Jersey. As the other evidence in the case clearly demonstrates, attitudes toward the minute of silence differ greatly from one New Jersey community to another. Las Cruces may reflect attitudes in some of them but certainly not in all or perhaps even in very many of them.

Having described the genesis of Bill 1064 and the reaction to its becoming effective, it is necessary to examine briefly its religious and educational implications.

Plaintiffs offered the testimony of Dr. Langdon Gilkey, professor of theology at the University of Chicago Divinity School and a Baptist minister. Dr. Gilkey teaches historical theology and the relationship of theological views to contemporary culture. He offered a definition of religion which is serviceable for the purpose of this case and

---

**3.** When the moment of silence was implemented in Las Cruces the school children were given notes to take home to their parents so that the family could discuss what the students would do during the silent moment. Dr. Thompson's four children exhibited a diversity of reactions.

His teen-age son believed the statute violated his constitutional rights. One daughter wished to use the moment for prayer. Another daughter asked if she could chant. A third daughter did not do much with the moment.

can be used to analyze the facts established here. It is a definition which, I believe, is in accord with the developing concept of religion reflected in more recent Supreme Court decisions, *see* Judge Adams' discussion of the definition of religion for constitutional purposes in his concurring opinion in *Malnak v. Yogi*, 592 F.2d 197, 200–215 (3d Cir.1979).

All religions, according to Dr. Gilkey, have three components: (i) each embodies a view of ultimate reality—especially as it concerns the human predicament and the resolution of the difficulties human beings confront as they proceed through life; (ii) each religion prescribes a way of life, which constitutes a response to the ultimate reality perceived by that religion; and (iii) each religion with its view of ultimate reality and its way of life is embodied in an historical community of faith which links the past, the present and the future.

The second element of religion—the way of life which responds to the perception of ultimate reality—includes such practices as participation in the sacraments and prayer. This is the point at which Assembly Bill 1064 is charged with impinging upon or furthering religion.

In the Christian, Jewish and Islamic religions God is viewed as the ultimate reality and prayer is usually central to the way of life which responds to that ultimate reality. In other religions, such as Buddhism, God may not be the ultimate reality and the response may be meditation or other observances rather than prayer.

Even where a principal component of a religion's way of life is prayer, the forms of prayer may differ widely, being conditioned by historical and cultural traditions, by time and by place. In the traditional American culture silence, bowing one's head and clasping one's hands is associated with prayer. This reflects the development of Protestantism, Reform Judaism and Catholicism. Historically, however, Catholics kneeled and Jews raised their hands. Members of the Islamic faith may kneel on prayer rugs, face east and call out loud upon Allah. For Quakers silence itself is prayer. For others prayer must be vocal. With the increasing cultural and religious diversity in the United States, with traditional western religions being supplemented by adherents of and converts to eastern religions, diversity in the forms of prayer has proliferated.

What the minute of silence Bill has done is to mandate that all students assume the posture of one traditional form of prayer. While this may provide the opportunity for many persons to engage in their kind of prayer, the enforcement of silence either in a seated or standing position prevents others from engaging in their kinds of prayer.

Like the Rev. George D. Younger, who testified as to the views of the American Baptist Churches of New Jersey, Dr. Gilkey was of the opinion that legislative acts such as Bill 1064 which may lead to objective prayer will have the effect of causing a rejection of genuine religion in all of its three components. That is to say, the intervention of the state is counterproductive—enforcement of religious observances will induce cynicism and resistance on the part of any healthy person and the rejection of that which the state is seeking to instill.

Intervenors maintain that Bill 1064 has a secular purpose, namely, providing a period of transition from the many concerns of the students outside of school to the work of the school. In support of this thesis the intervenors offered the testimony of Dr. Adam Scrupski, an associate professor at Rutgers Graduate School of Education. He was of the opinion that the minute of silence can serve a useful pedagogical function as a supplement to or as an opening exercise forming the boundary between school and not-school. Silence connotes seriousness and solemnity, as in a courtroom, library or place of worship, and having a teacher administer the period of silence serves to accentuate his or her role in the educational process. There is a need for a boundary, according to Dr. Scrupski, and a ritual such as a moment of silence serves to provide the boundary. He viewed the salute to the flag as a less effective boundary than it once was, although it can still serve that purpose.

The experience in Sayreville's schools certainly suggests that in combination with the flag salute and a song a brief period of silence serves a transition purpose.

The circumstances of Dr. Scrupski's retention as the intervenor's expert casts some doubt on the proposition that the State legislators enacted Bill 1064 in a search for the best method of effecting a transition from non-school to school activities. In the spring of 1983, long after the temporary restraining order was entered, Dr. Scrupski happened to discuss the Bill with a friend who worked on the staff of one of the Legislature's Committees on Education. The staff member asked him if there might be a secular purpose for the law. In the words of Dr. Scrupski, "He was interested in knowing if I thought there was a secular consequence, a good reason, so to speak". (Tr. at 546). Dr. Scrupski found a secular consequence and was retained to testify concerning it.

I will not summarize the testimony of plaintiffs' experts, Dr. Peter J. Kuriloff, associate professor of education at the University of Pennsylvania and Dr. Stanley L. Rosner, a professor at the College of Education at Temple University. Their testimony and that of the other witnesses of both parties convinces me beyond any doubt whatsoever that one minute of silence as a transitional device for all grade levels in all schools for all kinds and conditions of students has little educational justification. Frequently the bustle of the playground cannot be transformed into serious school work by a requirement to sit still; rather some alternative action must be engaged in to transfer the students' attention to the work of the school. For young children a minute of silence may be an eternity, while many older students could handle it with ease. For hyperactive or handicapped children a minute of silence may be an impossibility. There is no evidence that any school in New Jersey was having any difficulty effecting a transition from non-school to school. Even in Sayreville which incorporated a period of silence at the end of its active opening exercises, the authorities found that they could not handle more than 30 to 40 seconds of mandated silence and simply disregarded the Board of Education resolution which mandated a longer period.

It is unclear whether Bill 1064 requires that every student remain present during the minute of silence or whether it simply requires that every student be given an opportunity to observe a minute of silence with the right of those who do not wish to participate to absent themselves. If the former interpretation is adopted, it is quite clear from the Princeton experience that significant numbers of students and teachers will refuse to observe silence on religious or other grounds based on conscience. If the latter interpretation is adopted, varying numbers of students and teachers will elect to stay away from the observance. In either situation the exercise will have only marginal utility as a transitional device for all students.

Having set forth the evidence in some detail, it is possible to draw from it certain generalized factual findings [4]:

1. From a religious perspective New Jersey's population is diverse. It includes persons holding deep religious convictions; it includes persons who are indifferent to religion; it includes persons who, as a matter of conviction, belong to no organized religious body and engage in no religious observances.

2. The very substantial portion of New Jersey's population which considers itself

[4]. Numerous newspaper articles and similar published materials were offered and received in evidence. During the pretrial stages of the case it seemed that perhaps such sources would be the best evidence of the purpose and effect of the legislation under consideration. However, the testimony and other evidence produced by both sides at the trial proved to be far more helpful in this regard. The articles are clearly evidence of the purposes of the legislation and to some extent are supportive of testimony concerning the public's perception of the Bill 1064. However the articles do not form a basis for my findings as to the public's perception. Consequently it is unnecessary to determine the extent to which public perceptions can be gauged from newspaper articles (*see* on this subject the testimony of Professor Jerome L. Aumente of the Rutgers Journalism Institute).

religious exhibits great diversity as to all three aspects of religion, that is to say, as to views of the nature of ultimate reality, as to the outward practices observed to express views of ultimate reality, and as to the particular religious bodies to which adherence is given.

3. Prayer, which is a common practice of many different religious bodies, takes many forms. Each form of prayer can be associated with particular views of ultimate reality and with particular religious bodies.

4. A short period of group silence at the commencement of the day or at the commencement of an undertaking constitutes one of the traditional forms of prayer of major religious bodies in New Jersey.[5]

5. The purpose of Bill 1064 was to mandate a period at the start of each school day when all students would have an opportunity to engage in prayer. This conclusion is drawn from the facts that:

a. Until the early 1960's when the United States Supreme Court held that school-sponsored prayer and Bible reading in public schools are unconstitutional, the New Jersey public schools traditionally included prayer and Bible reading as part of their opening exercises.

b. There was and is substantial public sentiment that prayer should be a part of opening exercises.

c. In response to this public sentiment and, in some cases, by reason of personal conviction, many New Jersey legislators introduced one bill after another in an attempt to reintroduce prayer in the public schools notwithstanding the Supreme Court's ruling.

d. Assembly Bill 1064 prescribing a minute of silence is but the most recent of such bills motivated by these sentiments.

e. The driving force behind the Bill came from those who deeply and sincerely believed that an opportunity for prayer in the public schools at the beginning of each day should be mandated.

f. Similarly one driving force in opposition to the Bill came from religious persons who perceived the minute of silence as a State prescribed religious observance violating their deeply and sincerely held belief that the State cannot involve itself in religious matters.

g. Other opposition to the Bill came from non-religious persons who perceived the minute of silence as an enforced religious observance.

6. The purpose of the Bill, urged at the trial, to provide a transition from non-school life to school work is an after-the-fact rationalization and not the real purpose of the Bill. This conclusion is drawn from the facts that:

a. There is no evidence that any school lacked an effective means of making the transition from non-school to school through such devices as the salute to the flag, a song, a period of announcements and taking attendance and the like.

b. The agencies having the most knowledge and experience with educational matters, namely the school boards and teacher organizations throughout the State, overwhelmingly opposed the Bill on the ground that it had no educational value.

c. While the minute of silence might serve as a transition device for some students of more mature years, it could not serve as such a device for younger students, certain handicapped students and others.

d. The attempt to develop rational support for the thesis that a minute of silence served a transitional purpose commenced after this law suit was underway rather than before the Bill was adopted.

7. As implemented the Bill requires all students to assume a posture identified as the posture of prayer of certain religious groups.

8. Although the Bill is designed to give persons an opportunity to pray, in fact it only gives an opportunity to pray to those

---

**5.** The evidence produced at the trial of this case suggests that I spoke prematurely and over-simplified the situation when I concluded at the time plaintiffs applied for a temporary restraining order that "the statute on its face is neutral" and "does not purport by its terms to mandate prayer."

whose prayers can be performed in the prescribed posture. Others whose prayers require action and/or sound are precluded from engaging in prayer during the minute of silence.

9. The experiences of various schools during the weeks when the minute of silence was enforced suggests that some students will use the minute of silence to pray; some will use it to engage in thoughtful meditation; some will tolerate it though considering it boring and stupid; some who believe it violates their religious convictions will nevertheless submit to it, not wishing to risk public ridicule; some who believe it violates their religious convictions will either refuse to observe it or will absent themselves from the place where others are observing it.

### The Law

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The Fourteenth Amendment makes the First Amendment binding on the states. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

Bill 1064 requires that public school principals and teachers "shall permit students to observe 1 minute of silence to be used solely at the discretion of the individual student, before the opening exercises of each school day for quiet and private contemplation or introspection." "Contemplation" has been defined in Webster's as "meditation on spiritual things" and "introspection" has been defined as "looking into or within, as one's own mind" or "inspecting, as one's own thoughts or feelings." Very simply, the issue posed in this case is whether, Bill 1064 constitutes a law respecting an establishment of religion or prohibiting the free exercise thereof. I conclude that Bill 1064 does constitute such a law.[6]

The test, stated negatively, is that "[A] legislative enactment does not contravene the Establishment Clause if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive government entanglement with religion." *Committee for Public Education v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980); *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Gilfillan v. City of Philadelphia,* 637 F.2d 924 (3d Cir.1980); *Malnak v. Yogi, supra.* The statute under review does not pass muster under any of these criteria.

As found above, the purpose of Bill 1064 is religious not secular. Intervenors urge that "the unambiguous language of New Jersey's moment of silence law evidences a legislative interest to promote a secular purpose in a manner that is constitutionally neutral to religion." (Intervenors' Brief at 11, 12). Unless one examines the statute in a total vacuum, this conclusion is without rational basis. All the evidence points to the religious intent of this enactment—the period of more than a decade during which the New Jersey legislature sought to evade *Engel* and *Abington Township* in order to reintroduce a mandatory time for prayer in the public schools; the debate upon the Bill which was in terms of public prayer and State involvement in religion; the time and manner in which the minute of silence was mandated, following the form and posture of school prayer which was outlawed in the early 1960's.

This obvious attempt to cross the forbidden line becomes all the more apparent in light of the pretextual nature of the secular purpose advanced in this case. True, intervenors' witnesses testified that the Bill can serve as a useful boundary between non-school activities and school work. However,

---

**6.** Two recent law review articles have surveyed the law and analyzed the constitutional issues raised by moment or minute of silence laws in general. Note: Moments of Silence, 96 Harv.L. Rev. 1874 (1983); Note: Daily Moments of Silence in Public Schools, 58 N.Y.U.L.Rev. 364 (1983). Another recent law review article has analyzed New Jersey's minute of silence law. Drakeman, Prayer in the School, etc., 35 Rut.L. Rev. 341 (1983).

only the utterly naive would conclude that the Bill's advocates were fighting passionately for establishment of such a boundary. It is abundantly clear that once the Governor's veto had been overridden and litigation commenced, Bill 1064 became a statute in search of a secular purpose.

The intervenors urge, quite correctly, that "constitutional analysis of legislative purpose does not involve a judicial inquiry into supposed illicit legislative motive." (Intervenors' Brief at 26). There is a distinction, I believe, between the motives and purposes of individual legislators and an institutional legislative purpose. Legislators may have the purest of personal motives and produce unconstitutional legislation, and contrariwise individual legislators with wrongful motives may vote for a bill and produce legislation which is both beneficent and constitutional. This is illustrated by *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which upheld the provision of the Universal Military Training and Service Act of 1948 making it an offense to willfully and knowingly mutilate, destroy and change by burning a registration certificate. In light of the overwhelmingly obvious and important secular purpose of the Act, the Supreme Court upheld the constitutionality of this provision even though an incidental effect may have been to circumscribe a person's ability to express his views about the Act by burning his draft registration card. The Court noted that "this Court will not strike down *an otherwise constitutional statute* on the basis of an alleged illicit legislative motive". 391 U.S. at 383, 88 S.Ct. at 1682 (emphasis added). It declined, therefore, to give significance to the statements of one Senator and two House members as probative of the claim that the purpose of the provision at issue was to stifle free speech rather than to advance a secular purpose.

The present case is a far cry from *O'Brien.* Here there is no overwhelming secular purpose. Both the history of this kind of legislation and the circumstances of the adoption of this particular Bill point inescapably to an essentially religious purpose. The statements of the legislators in committee, on the floor and to the public as disclosed by the evidence in this case are consistent with and confirmatory of an institutional purpose to accomplish something the Constitution forbids.

Intervenors point to the language of Justice Brennan's concurring opinion in *Abington School District v. Schempp, supra,* as support for the proposition that a moment of silence is a secular device:

> The second justification [of prayer and Bible reading] assumes that religious exercises at the start of the school day may directly serve solely secular ends—for example, by fostering harmony and tolerance among the pupils, enhancing the authority of the teacher, and inspiring better discipline.

>     ·        ·        ·        ·        ·

> I have previously suggested that Torcaso and the Sunday Law Cases forbid the use of religious means to achieve secular ends where nonreligious means will suffice. That principle is readily applied to these cases. It has not been shown that readings from speeches and messages of great Americans, for example, or from the documents of our heritage of liberty, daily recitation of the Pledge of Allegiance, *or even the observance of a moment of reverent silence at the opening of class,* may not adequately serve the secular purposes of the devotional activities without jeopardizing either the religious liberties of any members of the community or the proper degree of separation between the spheres of religion and government.

374 U.S. at 280, 281, 83 S.Ct. at 1602–1603 (emphasis added).

The question of the purpose and effect of a minute or moment of silence was not at issue in *Abington.* That question is at issue in the present case, and I think a showing has been made that New Jersey's minute of silence does jeopardize the religious liberties of members of the community and breaches the proper degree of separation between the spheres of religion and government.

The conclusion I have reached is consistent with the most recent federal district court cases passing on the constitutionality of moment of silence laws. *Duffy v. Las*

*Cruces Public Schools, supra; Beck v. McElrath,* 548 F.Supp. 1161 (M.D.Tenn.1982); *see also Opinions of the Justices to the House, etc.,* 387 Mass. 1201, 440 N.E.2d 1159 (Sup.Jud.Ct.1982); *contra, Gaines v. Anderson,* 421 F.Supp. 337 (D.Mass.1976). Intervenors argue that New Jersey's statute is inherently different from the statutes under review in those cases because there "the plain language of the statute, which incorporated the word prayer, made apparent their predominantly religious purpose." (Intervenors' Brief p. 14). Given the history and circumstances of the enactment of Bill 1064, I think it is clear that the omission of the word "prayer" is a cosmetic change only, having no substantial effect. Illustrative of the lack of any practical effect is Sayreville's experience. There the town's original enactment provided for a two minute meditation period in order that the students have an opportunity to pray. The subsequent change in language to omit the reference to praying was not intended to result and did not result in any change in what was actually being done in the schools.

Nor do I believe that the recent Supreme Court case of *Marsh v. Chambers,* —— U.S. ——, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) was intended to modify the law governing State sponsored prayer in public schools. There the Court held that the practice of the Nebraska Legislature of opening each legislative day with a prayer by a chaplain paid by the State did not violate the Establishment Clause of the First Amendment. The Court noted an unbroken history of more than 200 years during which legislators opened their sessions with a prayer but emphasized that in *Marsh* "the individual claiming injury by the practice is an adult, presumably not readily susceptible to 'religious indoctrination'". At ——, ——, 103 S.Ct. at 3335. This latter comment, I believe, suggests a clear intent to distinguish legislative prayer by adults which, like the opening of court, is primarily of a traditional ceremonial nature from mandated prayer by school children.

■ Thus I conclude that Bill 1064 does not have a bona fide secular purpose and, in fact, has a religious purpose.

Turning to the second prong of the test of validity, I conclude that the Bill both advances and inhibits religion.

It advances the religion of some persons by mandating a period when all students and teachers must assume the traditional posture of prayer of some religious groups and during which those who pray in that manner can do so. This is exactly what happened during the time when Bill 1064 was in effect. In Sayreville, continuing past practice, students were instructed to sit, close their eyes and observe silence. In Hillsborough Township children were directed to sit and be quiet and still. In Roosevelt Junior High School students were instructed to stand up, bow their heads, close their eyes and observe silence.

Thus the State has injected itself into religious matters by designating a time and place when children and teachers may pray if they do so in a particular manner and by mandating conduct by all other children and teachers so that the prayers may proceed uninterrupted in their presence.

While this form of legislation advances the religion of some, it inhibits the religion of others in at least two ways.

First, there are those whose religious practices include silent prayer and meditation but who, as an article of faith, believe that the State should have no part in religious matters. For them mandated prayer is no longer prayer. It is their conviction that if the State requires any form of religious observance the observance is drained of its substance, loses its power and becomes but an empty shell. *Cf.,* Tillich, *Dynamics of Faith,* Ch. III, Symbols of Faith (Harper & Row 1958). Thus the State, seeking to further religion by mandating certain religious observances, in fact weakens religion by draining vitality from these observances.

Examples of this emasculating process can be seen in the cases. When a legislature routinely opens its sessions with prayer, when a court commences each day with "God save the United States and this honorable court", the courts have recognized that the effect is not to establish religion. Rath-

er, the words which are spoken may represent a solemn and traditional ceremony serving a valuable civil function. They are no longer the words of a believer responding to his views of ultimate reality; they are, therefore, no longer prayer either in a religious or constitutional sense. Certain of those who oppose Bill 1064 on religious grounds seek to spare their mode of prayer from such a fate.

Second, by mandating a minute of silence which permits some persons to engage in prayer, Bill 1064 prevents other persons from engaging in their kind of prayer. Justice Brennan noted in his concurring opinion in *Abington:*

> ... our religious composition makes us a vastly more diverse people than were our forefathers. They knew differences chiefly among Protestant sects. Today the Nation is far more heterogeneous religiously, including as it does substantial minorities not only of Catholics and Jews but as well of those who worship according to no version of the Bible and those who worship no God at all.... In the face of such profound changes, practices which may have been objectionable to no one in the time of Jefferson and Madison may today be highly offensive to many persons, the deeply devout and the nonbelievers alike.

The religious diversity of which Justice Brennan spoke in 1963 is far more pronounced now. Thus religious practices and the concepts of ultimate reality to which these practices point vary ever more widely. While once the prayers of most religious people could be carried on in an environment of silence, now that is no longer the case. The prayers of some persons require movement and sound. Bill 1064, therefore, mandates an environment which allows some to pray but which prevents others from engaging in their form of prayer.

Finally there are those who profess no religion and to whom any form of prayer is offensive. Bill 1064 requires these persons to assume a posture suggestive of particular forms of prayer which are responsive to particular beliefs about ultimate reality. Understandably those who do not share those beliefs do not wish to be required to maintain a pose which suggests that they do. Children holding these views, as illustrated in the present case, are forced either to endure an exercise which runs counter to their beliefs or to face public opprobrium or ridicule by asking to be excused each day.

There is nothing in the language or reasoning of the Supreme Court's opinion in *Mueller v. Allen,* —— U.S. ——, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) which affects the conclusion that the effect of Bill 1064 renders it unconstitutional. There the Court upheld a Minnesota statute which permitted taxpayers in computing their state income tax to deduct certain expenses incurred for the education of their children. This result was reached even though most such expenses involved payments on account of students attending private schools and even though it was established that 95% of such students attended sectarian schools. Applying the three point test, the Court concluded the tax deduction satisfied the primary effect inquiry. However, *Mueller* is of very limited utility in the present case. It is but the most recent in a long line of cases dealing with the question of the extent to which state legislation may, directly or indirectly, aid sectarian schools. The facts of those cases and the problems of church and state relations which they raise are quite different from the facts and problems raised by the school prayer cases.

Bill 1064 impermissibly advances the religion of some and inhibits the religion of others.

The third inquiry is whether Bill 1064 fosters an excessive government entanglement with religion. Implementation of the Bill would not involve the State in the kind of continued and pervasive monitoring of sectarian activities which was condemned in *Lemon v. Kurtzman, supra.* It would, however, tend to promote divisiveness among and between religious groups, another form of entanglement. *Gilfillan v. City of Philadelphia, supra,* at 932. A required minute of silence would put children and parents who believe in prayer in the public schools against children and parents who do not.

The events in Princeton are illustrative of this consequence. There the school administrators were threatened with disruptive behavior by students who believed the minute of silence constituted enforced prayer contrary to their own convictions. Elsewhere the opposition did not take the form of threatened disruption, but children and parents were forced to decide whether the children should submit to an exercise which violated their beliefs or whether they should separate themselves from their peers.

With no secular purpose being served, this degree of entanglement causes Bill 1064 to fail the third prong of the test of validity.

For the foregoing reasons Bill 1064 violates the First Amendment and plaintiffs are entitled to a judgment granting the declaratory and injunctive relief they seek.[7]

■ Under 42 U.S.C. § 1988 a prevailing party may in appropriate circumstances be entitled to recover attorneys fees. In the unusual circumstances of this case I do not believe that such an award is warranted.

The named defendants did not contest the action on the merits. They were not responsible for enactment of the legislation under review. There is no reason why they should be required to pay plaintiffs' attorneys fees.

The intervenors did oppose plaintiffs on the merits. However, even though they did not prevail, their participation in the case served a valuable public purpose. Without their participation the facts and the law would not have been developed adequately. In a difficult case such as this in which important public interests are involved, it was essential that the facts be developed and the law fully presented. Since intervenors' role in this case contributed significantly in that regard it would be inappropriate to charge them with attorneys fees.

For the same reason no costs will be allowed to any party.

Plaintiffs' attorneys are requested to prepare a form of order implementing this opinion.

---

7. Helpful amicus briefs were filed on behalf of the following organizations: New Jersey Education Association (by Zazzali, Zazzali & Kroll, James R. Zazzali, Esq. and Kenneth I. Nowak, Esq., on the brief); New Jersey Council of Churches (by Donald L. Drakeman, Esq.); Anti-Defamation League of B'nai B'rith, American Jewish Committee, Essex County Board of Rabbis, Jewish Federation of Central New Jersey, Jewish Federation of Southern New Jersey, New Jersey Association of Reform Rabbis, New Jersey-West Hudson Valley Council of the Union of American Hebrew Congregations, and United Synagogues of New Jersey (Howard T. Rosen, Esq.; Of Counsel: Justin J. Finger, Jeffrey P. Sinensky, Ruti G. Teitel, Samuel Rabinove, Andrea S. Klausner, James H. Laskey and Alan Goldstein); American Jewish Congress, Jewish Community Federation of Metropolitan New Jersey, Jewish Federation of North Jersey, Jewish Federation of Raritan Valley, Bayonne Jewish Community Council, and National Council of Jewish Women (by Stern, Steiger, Croland & Bornstein, P.A.; Of Counsel: Nathan Z. Dershowitz, Esq. and Marc D. Stern, Esq.; On the brief: Kenneth S. Goldrich, Esq., Marc D. Stern, Esq. and Jay Rubenstein, Esq.).