**KAREN B., et al., Plaintiffs-Appellants,**
v.
**David TREEN, et al.,**
**Defendants-Appellees.**

No. 80–4003.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 5, 1981.

Allen Sharp, District Judge for the Northern District of Indiana, sitting by designation, filed dissenting opinion.

Carole B. Shauffer, New Orleans, La., Mark Franklin Terry, Sacramento, Cal., for plaintiffs-appellants.

Helen S. Kohlman, Jonathan M. Lake, New Orleans, La., for Jewish Federation of Greater New Orleans.

Donald R. Mintz, Leopold Z. Sher, New Orleans, La., for Anti-Defamation League of B'Nai B'Rith.

Nathan Z. Dershowitz, New York City, William B. Duffy, Jr., Boston, Mass., for American Jewish Congress & the Unitarian Universalist Assn.

William J. Guste, Jr., Atty. Gen., Kendall L. Vick, Patricia Nalley Bowers, Asst. Attys. Gen., New Orleans, La., for Treen.

Jack A. Grant, Gretna, La., for Jefferson Parish School Bd., and Larry T. Sisung.

Before CHARLES CLARK and RANDALL, Circuit Judges, and SHARP *, District Judge.

CHARLES CLARK, Circuit Judge:

Parents of students were denied declaratory and injunctive relief from the Louisiana statute and derivative Jefferson Parish School Board regulations which establish guidelines for student participation in prayer at school. They contend that the statute and regulations offend the First Amendment proscription against enactment of laws respecting the establishment of religion. We agree and reverse the district court.

## I.

Louisiana Revised Statutes § 17:2115 (1981) has two components. Subsection A provides that each parish and city school board shall permit the appropriate local school authorities to allow those students and teachers who so desire to observe a brief period of silent meditation at the beginning of each school day. The statute expressly declares that this observance can neither be intended nor identified as a religious exercise. The plaintiffs have no quarrel with the silent meditation provision of the statute, and it is not involved in this litigation.

The challenged provision, subsection B, is essentially enabling legislation. It provides that a school board may authorize the appropriate school officials to allow each classroom teacher to ask whether any student wishes to offer a prayer and, if no

student volunteers, to permit the teacher to pray. The statute limits any prayer offered to no longer than five minutes and provides that no student or teacher may be compelled to pray. In the event a student in the classroom objects or the student's parent or legal guardian objects in writing to the proper school authority, subsection B provides that the student may not be required to participate or to be present during the time prayer is being offered. See La. Rev.Stat. § 17:2115(B) (1981).

The Jefferson Parish School Board has adopted a resolution establishing guidelines to implement section 17:2115(B) in parish schools. These guidelines provide that each school day will begin at the regular time with a minute of prayer followed by a minute of silent meditation. Under the school board guidelines, each teacher must ask if any student wishes to volunteer a prayer, and, if no student wishes to do so, the teacher may offer a prayer of his own. If the teacher elects not to pray, then the period of silent meditation would be observed immediately. The school board guidelines provide that no prayer may be longer than one minute in duration.

Jefferson Parish has also made elaborate provisions for excusing students who do not want to participate in the prayer portion of the morning exercises. According to a school board letter explaining the program to parents, any student who desires to participate in the minute of prayer must submit the express written permission of his parents and make a verbal request to join in the exercise. Students without this permission may either report to class, where they must remain seated and quiet throughout the morning exercises, or remain outside the classroom under other supervision. The school board guidelines also establish two alternative methods for dealing with the supervision of non-participating students. After the minute of prayer has been completed, all students must report to the classroom for a minute of silent meditation.

---

* District Judge for the Northern District of Indiana, sitting by designation.

After hearing testimony and argument, the district court held that section 17:2115(B) and the parish implementing regulations do not offend the Constitution but issued an injunction pending appeal in order to maintain the status quo.

## II.

The Establishment Clause of the First Amendment prohibits Congress and the states from enacting any law "respecting an establishment of religion." U.S. Const. Amendment I. *See Everson v. Board of Education*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). In *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the Supreme Court held that daily classroom recitation of a denominationally neutral, state-composed prayer violates the Establishment Clause even though students could be excused from participation. The following year, the Court held that daily Bible reading and class recitation of the Lord's Prayer also offends the Constitution, even though individual students were free not to attend the morning exercises. *School District of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Since that time, the Supreme Court has examined three principal criteria to determine whether a state legislative enactment comports with the Establishment Clause: (1) whether the statute has a secular legislative purpose, (2) whether the principal or primary effect of the statute is neither to advance nor to inhibit religion, and (3) whether the statute fosters "an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971). *See Stone v. Graham*, 449 U.S. 39, 40, 101 S.Ct. 192, 193, 66 L.Ed.2d 199, 201 (1980); *Committee for Public Education and Religious Liberty v. Regan*, 444 U.S. 646, 652, 100 S.Ct. 840, 846, 63 L.Ed.2d 94, 101 (1980); *Roemer v. Maryland Public Works Board*, 426 U.S. 736, 748, 96 S.Ct. 2337, 2348, 49 L.Ed.2d 179, 188 (1976). If a statute fails to satisfy any one of these three tests, it will not survive a constitutional attack brought under the Establishment Clause. *Stone v. Graham*, 449 U.S. at 40, 101 S.Ct. 192, at 193, 66 L.Ed.2d at 201. Applying these settled principles of constitutional jurisprudence, we hold that the Louisiana statute and Jefferson Parish regulations permitting student and teacher prayers in the public schools violate the First Amendment.

First, the district court found that section 17:2115(B) and the implementing regulations had a secular legislative purpose. It reached this conclusion relying upon the testimony of two state legislators who were primarily responsible for enactment of the statute and the school board member who sponsored the implementing resolution in Jefferson Parish. These witnesses stated that the purpose of the school prayer program was to increase religious tolerance by exposing school children to beliefs different from their own and to develop in students a greater esteem for themselves and others by enhancing their awareness of the spiritual dimensions of human nature.

Under the decisions of the Supreme Court, however, this testimonial avowal of secular legislative purpose is not sufficient to avoid conflict with the Establishment Clause. In *Stone v. Graham, supra,* the Court struck down a Kentucky statute requiring a copy of the Ten Commandments, purchased with private contributions, to be displayed on the wall of each public classroom. The Kentucky legislature had expressly required that each posted copy bear the following legend: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." 449 U.S. at 41, 101 S.Ct. at 193, 66 L.Ed.2d at 201 (citations omitted). Nevertheless, the Court held the statute unconstitutional.

The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments is undeniably a religious text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact.

*Id.* at ——, 101 S.Ct. at 194, 66 L.Ed.2d at 202 (footnote omitted). *See Schempp*, 374 U.S. at 223–24, 83 S.Ct. at 1572, 10 L.Ed.2d at 859.

■ Similarly, the plain language of section 17:2115(B) and of the Jefferson Parish guidelines makes apparent their predominantly religious purpose. Prayer is perhaps the quintessential religious practice for many of the world's faiths, and it plays a significant role in the devotional lives of most religious people. Indeed, since prayer is a primary religious activity in itself, its observance in public school classrooms has, if anything, a more obviously religious purpose than merely displaying a copy of a religious text in the classroom. Even if the avowed objective of the legislature and school board is not itself strictly religious, it is sought to be achieved through the observance of an intrinsically religious practice. The unmistakable message of the Supreme Court's teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interests. *See Schempp*, 374 U.S. at 224, 83 S.Ct. at 1572, 10 L.Ed.2d at 859. Furthermore, the legislature's provision for excusing students who do not desire to participate in the daily prayer session betrays its recognition of the fundamentally religious character of the exercise. *Id.*

Nevertheless, the defendants urge that this case is distinguishable from *Stone* and *Schempp* because the district court had before it the live testimony of the legislators and school board member who sponsored the prayer program. They do not explain, however, how the personal asseverations of individual legislators can be more compelling than the expression of secular intent actually embodied in the statute. In fact, the personal testimony of individual proponents, given in court after enactment of the statute, is far less persuasive, since it reflects only the partial perspectives of those legislators and not the collective intention of the entire legislative body. Neither such testimony nor the words of the enactment is sufficient to overcome the obvious religious means employed by the statute. Therefore, La.Rev.Stat. § 17:2115(B) violates the first prong of the test.

■ Second, the district court held that section 17:2115(B) and the Jefferson Parish program do not inhibit or promote religion. This conclusion was predicated upon the judge's conviction that the prayer offered by a student or by a teacher could very well comprehend some secular objective. Thus, the district court asserted that the prayers could "relate to anything from sports to the weather to religion."

This analysis is disingenuous. Prayer is an address of entreaty, supplication, praise, or thanksgiving directed to some sacred or divine spirit, being, or object. That it may contemplate some wholly secular objective cannot alter the inherently religious character of the exercise. Section 17:2115(B) and the parish implementing guidelines promote religion by encouraging observance of a religious ritual in the classroom.

■ The defendants contend that the challenged statute and regulations are not constitutionally infirm because they are entirely content-neutral and because student participation in the daily prayer is purely voluntary. Neither of these features cures the constitutional defect.

■ That the challenged provisions do not prescribe any particular form of prayer and do not promote some sectarian religious practice is without constitutional significance. The Supreme Court consistently has expressed the view that the First Amendment demands absolute governmental neutrality with respect to religion, neither advancing nor inhibiting any particular religious belief or practice and neither encouraging nor discouraging religious belief or unbelief. Thus, the Court could say,

> It is now firmly established that a law may be one "respecting an establishment of religion" even though its consequence is not to promote a "state religion" and even though it does not aid one religion more than another but merely benefits all religions alike.

*Committee for Public Education v. Nyquist*, 413 U.S. 756, 771, 93 S.Ct. 2955, 2964–65, 37

L.Ed.2d 948, 962 (1973). *See Engel,* 370 U.S. at 430, 82 S.Ct. at 1266–67, 8 L.Ed.2d at 607; *McCollum v. Board of Education,* 333 U.S. 203, 210–11, 68 S.Ct. 461, 464–65, 92 L.Ed. 649, 658 (1948); *Everson,* 330 U.S. at 15–16, 67 S.Ct. at 511, 91 L.Ed. at 723.

State and school officials point out that student participation in the daily prayer session is allowed to be wholly voluntary. This fact is not relevant to the Establishment Clause inquiry. As the Supreme Court said in *Engel,* "Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of students is voluntary can serve to free it from the limitations of the Establishment Clause . . . ." 370 U.S. at 430, 82 S.Ct. at 1266–67, 8 L.Ed.2d 607. The Court then reiterated this principle in *Schempp,* stating that the constitutional defect of the religious exercises involved was not "mitigated by the fact that individual students may absent themselves upon parental request, for that fact furnishes no defense to a claim of unconstitutionality under the Establishment Clause." 374 U.S. at 224–25, 83 S.Ct. at 1573, 10 L.Ed.2d at 859. The result is the same even though Jefferson Parish students must affirmatively request to participate in the prayer observance, for an Establishment Clause violation does not depend upon the presence of actual governmental coercion. *See Schempp,* 374 U.S. at 223, 83 S.Ct. at 1572, 10 L.Ed.2d at 858; *Engel,* 370 U.S. at 430, 82 S.Ct. at 1267, 8 L.Ed.2d at 607. Because section 17:2115(B) and the parish regulations promote an inherently religious practice, it violates the second prong of the test.

Third, the district court found that the statute, as implemented in the Jefferson Parish regulations, would not result in excessive governmental entanglement with religion. This finding was based on the provision for affirmative voluntary participation. As we have shown, this feature of the plan does not cure the constitutional infirmity.

The Jefferson Parish program has yet to be put into effect. Thus, the nature and extent of state involvement in religious activity is in some measure speculative at this time. What is certain is that the statute itself makes inappropriate governmental involvement in religious affairs inevitable. Louisiana makes school attendance compulsory for children seven to sixteen years of age. La.Rev.Stat. § 17:221(A) (1981). The morning exercises take place on school property during regular school hours. The statute authorizes the classroom teacher to conduct the prayer observance, requiring him to select among any student volunteers and allowing him to pray if no student wishes to pray. The teacher must monitor the daily classroom activities and enforce the one minute time limitation. Moreover, school authorities have a statutory duty to supervise the implementation of the prayer program in order to guarantee that all participation would remain purely voluntary. It is clear that "the very restrictions and surveillance necessary to ensure that teachers play a strictly nonideological role give rise to entanglements between church and state." *Lemon v. Kurtzman,* 403 U.S. at 620–21, 91 S.Ct. at 2115, 29 L.Ed.2d at 760. Because section 17:2115(B) and the Jefferson Parish procedures necessarily entail excessive governmental entanglements with religious activity, they violate the third prong of the test.

The district court expressed concern that striking down this public school prayer program would reflect a hostile attitude toward prayer and religion. This sort of self-created validation is unwarranted. *See Engel,* 370 U.S. at 433–35, 82 S.Ct. at 1268–69, 8 L.Ed.2d at 609–10. The Establishment Clause was, of course, intended to prevent persecution of religious minorities by civil authorities. But it also embodies the constitutional framers' concerns about the proper role of government and for the integrity of religion. Justice Black summarized this function of the Establishment Clause in the following terms:

Its first and most immediate purpose rested on the belief that a union of government and religion tends to destroy government and to degrade religion . . . .

The Establishment Clause thus stands as an expression of principle on the part of the Founders of our Constitution that religion is too sacred, too holy, to permit its "unhallowed perversion" by a civil magistrate.

*Engel,* 370 U.S. at 431, 82 S.Ct. at 1267, 8 L.Ed.2d at 608 (footnotes omitted). To say that the Constitution forbids what Louisiana and Jefferson Parish have done is only to give effect to this special constitutional solicitude for the vitality of religion in American life.

For the foregoing reasons, the judgment of the district court is reversed and the case remanded for proceedings not inconsistent with this opinion.

REVERSED and REMANDED.

ALLEN SHARP, District Judge, dissenting:

This case involves the careful sorting of several very important First Amendment values in the context of the public school classroom. My distinguished panel colleagues have sorted those values to reach a result with which I cannot concur. With respectful deference I therefore dissent.

The establishment of religious freedom is not the same thing as the establishment of a religion.

I believe that the majority has misapplied the Establishment Clause. I believe that the challenged legislation has the primary purpose and effect of promoting not religion, but religious freedom. The majority has found that the Establishment Clause prohibits voluntary audible prayer of any kind at any time in the public schools. The program which the challenged legislation creates is voluntary, has no sectarian substance, and does not materially interfere with the educational function of public schools. I share the district court's concern that this decision will be received as projecting a governmental hostility towards religion.

I.

The state and the school board were in a posture more friendly to religion after the adoption of the challenged legislation than they were in before its adoption. But legislation which moves a government into a posture relatively more friendly to religion is not *ipso facto* in violation of the Establishment Clause. Likewise, legislation which moves a government into a posture relatively more hostile to religion is not *ipso facto* in violation of either the Establishment Clause or the Free Exercise Clause. For example, a taxing authority can choose to adopt or repeal tax exemption for church property. Likewise, a public school can choose to prohibit or allow the uttering of audible prayers by students. The Establishment and Free Exercise Clauses are bounds within which governments are free to move in their activities which effect religion. A governmental body oversteps the Establishment Clause by adopting legislation which violates one of three tests. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion (citation omitted); finally, the statute must not foster 'an excessive government entanglement with religion.'" *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

These tests are not rigid. The language used to state the tests betrays considerable flexibility. The second test does not prohibit a statute from having an effect of advancing religion, unless advancing religion is the statute's "principal or primary" effect. The last test does not prohibit all governmental entanglement with religion, but only that entanglement which is "excessive." The constitutional line of separation between church and state, "far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Id.* at 614, 91 S.Ct. at 2112.

The challenged legislation satisfies all of the three criteria of the Establishment Clause. The legislative purpose of the challenged program was to provide religious freedom, a purpose no more religious than

the First Amendment. Furthermore, the challenged legislation has the primary effect of advancing not religion, but religious freedom. And it does so without excessive governmental entanglement with religion.

### A.

This legislation does not violate the first criterion of the Establishment Clause. This legislation has a secular legislative purpose.

I agree that the District Court was clearly in error in finding that the purpose behind the challenged legislation was to provide a mechanism by which children could learn about beliefs different from their own, focus on spiritual aspects of human nature, and thereby develop an increased regard for themselves and their peers. I also agree that prayer is an inherently religious exercise. There is no doubt in my mind that the challenged legislation was the direct result of pressure from parents who wanted their children, at the beginning of each school day, to have an opportunity to formally and audibly recognize the existence of, and seek the benevolence of, a supreme being. It seems clear to me that the purpose behind the challenged legislation was to provide students with the freedom to engage in a religious exercise, opening their school day with an audible prayer.

But it seems to me that this is a perfectly legitimate, secular purpose. Providing the freedom to engage in religious exercises is the purpose of the Free Exercise Clause of the First Amendment. It can surely not be argued that the First Amendment has a religious purpose. The purpose of the challenged legislation is to provide students with a small portion of the religious freedom which they are guaranteed outside the classroom. School attendance is, after all, compulsory in Louisiana. Compulsory school attendance forces many students into public schools, thereby unavoidably curtailing their freedom to engage in religious exercises. For Louisiana to reduce its restraint on student's religious freedom is perfectly legitimate.

If a student's religion required him or her to utter an audible prayer at the beginning of each school day, the Free Exercise Clause would require the school to accommodate that requirement. Unfortunately for the students who would have participated in the program in this case, their religion did not require them to utter such an audible prayer, even though their religion apparently encouraged it sufficiently for their parents to petition the state legislature to provide for the allowance of such an audible prayer. I do not read the Establishment Clause to prohibit all audible public school prayer which the Free Exercise Clause does not protect. "[I]t is hardly impermissible for Congress to attempt to accommodate free exercise values, in line with 'our happy tradition' of 'avoiding unnecessary clashes with the dictates of conscience.'" *Gillette v. United States*, 401 U.S. 437, 453, 91 S.Ct. 828, 838, 28 L.Ed.2d 168 (1971). "The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Walz v. Tax Commission of New York*, 397 U.S. 664, 673, 90 S.Ct. 1409, 1413, 25 L.Ed.2d 697 (1970).

Louisiana and the Jefferson Parish School Board have not attempted to establish a religion; rather, they have attempted to provide religious freedom.

### B.

Nor does it seem to me that this legislation violates the second criterion of the Establishment Clause. The primary effect of the challenged legislation is neither to advance nor to inhibit religion, but rather to advance religious freedom.

There are only three ways in which a state could possibly treat audible prayer in public schools; require it, allow it, or prohibit it. Requiring it would be an elementary violation of the Establishment Clause. But it seems to me that the state should be allowed to choose between allowing audible prayer and prohibiting it. Compared to each other, allowing audible prayer advances religion, and prohibiting audible prayer inhibits religion. Prohibiting audible prayer may have the effect of inhibiting religion, but does not violate the Establish-

ment Clause because prohibiting audible prayer has the primary effect of enabling the school to conveniently maintain order. Allowing audible prayer may have the effect of advancing religion, but (when the government does not establish the prayer's content) does not violate the Establishment Clause because allowing audible prayer has the primary effect of promoting religious freedom.

Not every law which incidentally benefits religion violates this second criterion of the Establishment Clause. Even in cases where the government provides financial aid to schools with religious affiliation, the obvious benefit to religion does not render the program violative of the Establishment Clause.

> Whatever may be its initial appeal, the proposition that the Establishment Clause prohibits any program which in some manner aids an institution with a religious affiliation has consistently been rejected. E. g., *Bradfield v. Roberts*, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899); *Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971). Stated another way, the Court has not accepted the recurrent argument that all aid is forbidden because aid to one aspect of an institution frees it to spend its other resources on religious ends.

*Hunt v. McNair*, 413 U.S. 734, 742–43, 93 S.Ct. 2868, 2873–74, 37 L.Ed.2d 923 (1973). An incidental benefit to religion is irrelevant if the challenged legislation has a legitimate primary or principle effect.

A program of voluntary religious exercise does not have the primary effect of advancing religious freedom if the government establishes the substantive content of the exercise. Such a program has the primary effect of advancing a state religion. Thus, the Supreme Court has ruled that "each separate government in this country should stay out of the business of writing or sanctioning official prayers and leave that purely religious function to the people themselves and to those the people choose to look to for religious guidance." *Engel v. Vitale*,

370 U.S. 421, 435, 82 S.Ct. 1261, 1269, 8 L.Ed.2d 601 (1962); *Accord, School District of Abington Twp., Pa., v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (State required opening of school day with Bible reading, giving students the option of absenting themselves.); *See also, Stone v. Graham*, 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed. 199 (1980) (State required classroom posting of Ten Commandments.), *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (State prohibited teaching evolution.). Government is not allowed to concern itself with determining the legitimacy of the substantive content of the practices or teachings of religions or non-religious world views. Voluntariness is utterly irrelevant when the challenged legislation establishes the substantive content of a religious activity. Such legislation has the primary effect of advancing not religious freedom, but a state religion.

Likewise, a government's lack of concern with substantive content is irrelevant when the challenged legislation provides for involuntary programs which benefit religion. Thus coercive "release time" programs for religious training violate the Establishment Clause even when the government does not concern itself with the content of the religious teaching. In *McCollum v. Board of Education*, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), the Supreme Court said,

> The foregoing facts, without reference to others that appear in the record, show the use of tax-supported property for religious instruction and the close cooperation between the school authorities and the religious council in promoting religious education. The operation of the state's compulsory education system thus assists and is integrated with the program of religious instruction carried on by separate religious sects. Pupils compelled by law to go to school for secular education are released in part from their legal duty upon the condition that they attend the religious classes. This is beyond all question a utilization of the tax-established and tax-supported public school system to aid religious groups to spread their faith.
> . . . .

Here not only are the state's tax-supported public school buildings used for the dissemination of religious doctrines. The State also affords sectarian groups an invaluable aid in that it helps to provide pupils for their religious classes through use of the state's compulsory public school machinery. This is not separation of Church and State.

333 U.S. at 209–12, 68 S.Ct. at 464–65. *Cf. Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (Non-coercive "release time" program, for religious training off of school premises, does not violate the Establishment Clause.). Government is not allowed to use its coercive power for the benefit of religions. That the government is unconcerned with the substantive content of the religions it is benefitting is utterly irrelevant when the challenged legislation invokes the government's coercive power to benefit religions. Such legislation has the primary effect of advancing not religious freedom, but religion.

But, where the legislatively created program is both voluntary and without substantive content, it can have the primary effect of advancing neither a state religion nor religion in general, but religious freedom. The legislation in this case has the primary effect of advancing religious freedom. This is not a case where tax-supported public school property is used to aid religious groups to spread their faith to students coerced into attending classes in religious instruction. This is not even a case where tax-supported public school property is used to aid religious groups to spread their faith to students who voluntarily participate. In this case, students coerced into attending public schools are allowed to engage in a religious activity the contents of which they themselves determine. As the Supreme Court has said,

[I]t is now firmly established that a law may be one "respecting an establishment of religion" even though its consequence is not to promote a "state religion" (citation deleted), and even though it does not aid one religion more than another but merely benefits all religions alike. (citation deleted) It is equally well established, however, that not every law that confers an "indirect," "remote," or "incidental" benefit upon religious institutions is, for that reason alone, constitutionally invalid. (citations deleted) What our cases require is careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects.

*Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 771–72, 93 S.Ct. 2955, 2964–65, 37 L.Ed.2d 948 (1973). It does not seem to me that this legislation furthers any of the evils against which the Establishment Clause protects.

The primary effect of the challenged legislation is not to advance religion; rather, the primary effect is to advance religious freedom.

### C.

Finally, this legislation does not violate the third criterion of the Establishment Clause. The government entanglement with religion which is fostered by the challenged legislation is hardly excessive; it is *de minimus.* The program established by the challenged legislation is necessarily conducted on public school property, but the amount of time involved does not materially affect the educational function of the school. The state limits the time period to five minutes, and Jefferson Parish limits the time period to one minute. School officials' monitoring of the program to guarantee voluntariness, to enforce time limitations, and to choose among student volunteers simply does not raise the level of the government's entanglement to "excessive."

If some students wish to open their school day with an audible prayer, an indisputably religious activity, it seems to me that the Constitution does not prohibit them from doing so.

Teachers are, at least from the perspective of the students, government officials. *Cf. Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (Teachers have First Amendment rights which must be considered in the area of labor relations.) It is troubling that this legislation expressly allows teachers to of-

fer audible prayer, because there is a danger that from this provision teachers would infer authority to conduct the prayer period in a manner which violates the Establishment Clause. But teachers are aware of the Establishment Clause restraints placed on them by their status as government officials. And not every prayer uttered by a government official violates the Establishment Clause. Otherwise the Constitution would prohibit, for example, the perfunctory invocation with which this Court's daily sessions are opened. Whether teachers would abuse this legislative program is a case entirely different from the case now before this Court. There is, of course, no record on which to determine the existence of any such abuse, because the legislative program was never put into effect. The case before this Court now is a challenge to the legislation on its face. On its face, the legislation does not authorize teachers to violate the Establishment Clause.

It is my opinion that the challenged legislation has the legitimate, secular, purpose and effect of providing religious freedom, with minimal governmental entanglement with religion. It is my opinion that the challenged legislation is constitutional. I would affirm the decision of the District Court.