Susan Breseman WALTER, as natural parent of Gregory O. Walter and Christopher S. Walter, infants, and Susan Breseman Walter, individually; Howard N. Keener, Jr., as natural parent of Thad Keener, an infant, and Howard N. Keener, Jr., individually; Mostasa Shaaban and Aziza Shaaban, as natural parents of Sami Shaaban, an infant, and Mostasa Shaaban and Aziza Shaaban, individually; James F. Hores and Sandra P. Hores, as natural parents of Brian Hores, Liane J. Hores, and Brent Hores, infants, and James F. Hores and Sandra P. Hores, individually; John F. Price, as natural parent of David Price, Douglas Price, and Gregory Price, infants, and John F. Price, individually; and on behalf of all others similarly situated; except Jerry Grugin, Farmington, WV, and Mr. and Mrs. Ernest Mitehem, Charlestown, WV; Betty Jo Lloyd, an individual, Florette S. Angel, an individual, the National Council of Jewish Women—Charleston, West Virginia Section, Inc., a non-profit corporation; and the West Virginia Civil Liberties Union, a non-profit corporation, Plaintiffs,

v.

WEST VIRGINIA BOARD OF EDUCATION: Roy Truby, Superintendent of the West Virginia Board of Education; Edward Lakey, Superintendent of Kanawha County Board of Education; Kanawha County Board of Education; George M. Edwards, Superintendent of Fayette County Board of Education; Fayette County Board of Education; James D. Lannan, Superintendent of Jackson County Board of Education; and Jackson County Board of Education, and all other similarly situated county superintendents of schools and county boards of education, Defendants.

Civ. A. No. 84–5366.

United States District Court, S.D. West Virginia.

March 14, 1985.

Larry L. Rowe, Charleston, W.Va., for plaintiffs.

Walt Auvil, Asst. Atty. Gen., Charleston, W.Va., for defendants.

## ORDER GRANTING DECLARATORY AND INJUNCTIVE RELIEF

HALLANAN, District Judge.

Plaintiffs in this class action for declaratory and injunctive relief request that the Court declare Article 3, Section 15–a[1] (hereinafter, "the Amendment") of the West Virginia Constitution, now commonly referred to as the "Prayer Amendment," unconstitutional as violative of their rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution. Plaintiffs further seek to have this Court permanently enjoin implementation of said Amendment in West Virginia's public schools.

This action was brought pursuant to Title 42 United States Code § 1983, Title 28 United States Code §§ 2201 and 2202, and directly under the First and Fourteenth Amendments to the United States Constitution.

This Court has jurisdiction over the parties and the subject matter herein falls within the ambit of Title 28 United States Code § 1343(3). Venue is proper by virtue of Title 28 United States Code § 1392(a).

After denying temporary relief on two occasions,[2] this Court determined that Plaintiffs had met their burden of proof with respect to their application for preliminary injunctive relief and granted a preliminary injunction halting implementation of the Amendment pending resolution of the merits of the issues raised.

Extensive hearings were conducted in this matter, the Court heard testimony of a number of witnesses and the arguments of counsel, and received certain documentary evidence. The Defendants did not present any witnesses nor did any person appear voluntarily to testify in behalf of the Amendment, including any member of the Legislature or representatives of any of the 55 county school systems.

A partial summary of Plaintiffs' evidence is set forth below.

An eleven year-old child of the Jewish faith testified as follows:

"DIRECT EXAMINATION

BY MR. ROWE:

Q  I believe you stated before that you were in public school;—

A  Uh-huh.

Q  —is that right?

A  Uh-huh.

Q  Were you in public school last week?

A  Uh-huh.

Q  When was your holiday over?

A  We went back to school on Wednesday.

Q  I'd ask you to speak up as loudly as you can so everybody can hear, even the folks way in the back. Your holiday ended on Wednesday of last week?

A  3rd, 2nd.

---

1.  *W.Va. Const.* Art. III, § 15–a provides:
    "Public schools shall provide a designated brief time at the beginning of each school day for any student desiring to exercise their right to personal and private contemplation, meditation, or prayer. No student of a public school may be denied their right to personal and private contemplation, meditation or prayer nor shall any student be required or encouraged to engage in any given contemplation, meditation or prayer as a part of the school curriculum."

2.  *See,* Orders Entered December 10, 1984, and January 9, 1985. Additionally, the Court Ordered that the hearing on the application for a preliminary injunction be consolidated with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). Further, the Court's Order entered on December 10, 1984, certified the class of Plaintiffs as "all parents and guardians of all infants and persons who presently attend public schools in West Virginia who object to the provisions of Article 3, Section 15–a and are affected thereby." The Defendant class was certified to include "all present county school superintendents and county boards of education located in the State of West Virginia." Fed.R.Civ.P. 23(a) and (b)(3). Notice was properly given through publication in accordance with Fed.R.Civ.P. 23(c)(2). Three persons notified the Court of their desire to opt out of the Plaintiff class, Mr. Jerry Grugin of Farmington, West Virginia, and Mr. and Mrs. Ernest Mitehem of Charlestown, West Virginia. Said individuals are, accordingly, ORDERED excluded from the Plaintiff class.

Q Okay. Was there any time after you went back to school that you heard announced that there would be a time for meditation, contemplation, or prayer, anything like that?

A Yes. On Wednesday our teacher started explaining it to us and then on Thursday (sic) our principal or guidance counselor read the guidelines for it to us over the intercom.

Q Okay. Now, was this at a particular time during the day?

A Uh-huh, during home room, which is fifteen minutes before the beginning of the classes.

Q Okay. So this is the first thing you do during the day?

A Uh-huh.

Q Okay. And are you saying that you go to home room first before you go to any of the classes?

A Yes.

Q Okay. What happens at home room usually?

A Before or after the amendment went into effect?

Q Well, before the amendment went into effect.

A We would come in and our teacher would take the roll and then over the intercom we would do the Pledge of Allegiance and then if there were any announcements to be made such as like what was happening after school then the principal or guidance counselor would make them.

Q Okay. And would roll be taken?

A Yeah.

Q Okay. And you say this took about fifteen minutes?

A Uh-huh, unless there was some reason that they needed more time.

Q Okay. Now, what happened on Wednesday in home room?

A On Wednesday our teacher kind of started to explain to us about the guidelines for the amendment for meditation, I guess you'd call it, and he didn't get very far because the bell rang for us to go to first period, so we had to go to first period.

Q Okay. And then did anything else happen concerning the amendment that day?

A Not really. He just kind of started telling us about it.

Q Okay. And then the next day what happened?

A Well, then the next day our principal or guidance counselor read the whole sheet of guidelines to us. Then we had the moment of silence and I read a book during it.

Q Okay. Did, what kind of book did you read?

A Science fiction.

Q Okay. A fantasy book?

A Uh-huh.

Q Do you understand the difference between fantasy and reality?

A Uh-huh.

Q Do you like fantasy books?

A Yep.

Q Okay. Did anything happen or did anybody say anything to you during home room about that?

A No.

Q Okay. How long did the, did the period last?

A I'm not exactly sure. It may have been a minute, may have been thirty seconds. I don't know.

Q You say that they read something to you. You referred to the guidelines. Do you remember the substance of any of those, what they did?

A Well, basically they said, they told us how long it was supposed to be and quite a few times they kept saying, "contemplation, meditation, and prayer," and then towards the end they told us that if we had any religious questions, we would be referred to our parents or to, I think the phrase was "a leader of our faith," but I am not exactly sure about the phrasing.

Q And then after that what was said?

A After that, we did the Pledge of Allegiance.

Q Okay. Did you participate in the Pledge of Allegiance?

A Yes.

Q Okay. And were there announcements?

A I don't think there were very many that day.

Q Okay. And then what happened after the bell rang?

A Well, we all went to first period.

Q Okay. Anything happen to you in first period?

A No.

Q Okay. How about second period?

A Well, in second period, which was science, our teacher left the room to go find something and one of the people who was in my home room turned around and asked me why I had been reading a book during the moment of silence. And I told him that I didn't have to pray then and I didn't want to and then he told me that I should be praying all the time and then he said something to the effect that if I prayed all the time, maybe I could go to heaven with all the Christians when Jesus came for the second time instead of, as he put it, going down with all the other Jews.

Q Okay. Are you a member of the Jewish faith?

A Uh-huh.

Q That's your religion?

A Uh-huh.

Q Did he know that you were a member of that faith?

A Yes, he did.

Q Okay. And do you know what he meant about going to heaven or going down?

A Well, I think he, from what—

Q What did it mean to you?

A Well, I think it meant that he was saying that certain people were going to all go to heaven. I mean, it didn't make much sense to me because I don't know anything about his faith and that the rest of the people were going to, you know, be stuck someplace if they didn't believe in the right things.

Q Okay. Did he say what the right things were to believe in?

A Uh-huh.

Q What did he say?

A Well, he said that you should believe in Christ basically.

Q Okay. Did you say anything to him?

A I tried to explain to him that I had my own beliefs and that I went by, I followed my beliefs and not his and, you know, when the time came, it was going to be my problem and not his.

Q Did anybody else participate in the conversation?

A Yes. There was another person who, this first boy told another boy that the Jews only used the Old Testament and they didn't use the New Testament and this other boy thought that it was really stupid and then there was some period of another, of more speech, more conversation that I don't remember, but then the second boy said something to the effect that, why was he even trying to talk to me because the Jews weren't worth saving because they had killed Christ and that was about the end of it.

Q Okay. Did you say anything after that or—

A Well, I, not really. I just, I guess I said, I just told him it was my right not to pray and he, I had my rights and he had his.

Q Okay. How did you feel about that?

A Well, I felt, you know, hurt. Then I kind of felt angry because I didn't think it was fair that he should be able to say things like that during school and get away with it. I also felt kind of uncomfortable because it's kind of hard to try and tell somebody that, who keeps on talking that you are not listening to them.

Q Okay. Did you, did you talk with your teacher?

A No, I didn't.

Q Any reason that you didn't or—

A   Well, I was afraid that the teacher either wouldn't listen or if the teacher did listen, there would be a big issue made out of it and I would be in the limelight for the wrong reasons and I was afraid that I could have a lot of bad publicity, I guess you'd say, from that.

Q   Okay.   You mean in your school?

A   Uh-huh." (Tr. 19–25).

A Baptist pastor testified that he objects to prayer "in a school setting where everyone else is praying as an act of religious faith and so forth, not because one could do that just because everyone else is doing it, it's something one chooses or affirms for himself or herself."

The pastor said, "It tends to trivialize one's religious devotion and that makes it, well, it sometimes borders on sacrilege."

A 12-year old boy of the Roman Catholic faith testified he is afraid to challenge his teacher's directions to stand and pray each morning because he might receive demerits for "doing wrong or disobeying the teacher."   Other witnesses representing the Lutheran, Roman Catholic, Moslem and Jewish faiths and the teaching and psychology professions also testified in opposition to the Amendment.

The parties have exhaustively briefed the issues joined, the record is complete, and the matter is now mature for decision on the merits.

The ultimate issue for decision is a straightforward one.   Does *W.Va. Const.* Art. III, § 15–a impermissibly infringe upon Plaintiffs' rights under the "Establishment Clause" of the First Amendment?

United States Constitution Amendment 1 provides:

Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

There is no challenge raised herein with respect to the Plaintiffs' standing in this matter, nor has a defense been asserted on the matter of the existence of a case or controversy.   The Court finds that Plaintiffs do have standing to challenge the constitutionality of the Amendment and that an actual case or controversy is before the Court making declaratory relief appropriate.   28 U.S.C. § 2201.

After a thorough review of the applicable law on the issues raised herein, the Court has concluded that its task from a legal standpoint is a relatively simple one, in view of the ample precedent available to guide the Court's deliberation.

From a personal and moral standpoint, however, the decision herein contained is the most difficult one with which this Court has ever been faced and indeed, is likely as exacting as any which will ever come before it.

Nevertheless, as the Court has noted, the sworn duty imposed upon this Court to uphold the law of these United States must and shall be held inviolate.

■   It is the duty of this Court to interpret the law of the United States, not to make it.   The latter function belongs to the Congress of the United States.   It is a fixed star in our form of government that the final arbiter of constitutional questions such as this one is the United States Supreme Court.   This Court is duty bound to follow the precedent established by that Court and fully intends to do so in all matters which come before it lest "anarchy [shall] prevail within the federal judicial system."   *Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982).

Without question, Plaintiffs have established a factual basis for their claims herein through the testimonial and documentary evidence in this record.   The question for the Court at this juncture is one of law.

The Supreme Court has examined with meticulous scrutiny the parameters of the "Establishment Clause" on a number of occasions.

In *Everson v. Board of Education of Ewing Tp.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the Court observed:

> The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of Jefferson, the clause against establishment of religion by law was intended to erect 'a wall of separation between Church and State.' [Citation omitted].

*Id.* at 15–16, 67 S.Ct. at 511–512. *See also, School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

Mr. Justice Black eloquently examined the historical basis which underlay inclusion of the "Establishment Clause" in the First Amendment in *Engle,*[3] where the Court struck down a New York law which required prayer in the public schools.

While the United States Supreme Court has not spoken with respect to the application of the "Establishment Clause" to the particulars of provisions such as those with which we are here concerned, it will soon have opportunity to do so.

**3.** "It is an unfortunate fact of history that when some of the very groups which had most strenuously opposed the established Church of England found themselves sufficiently in control of colonial governments in this country to write their own prayers into laws, they passed laws making their own religion the official religion of their respective colonies. [Footnote omitted]. Indeed, as late as the time of the Revolutionary War, there were established churches in at least eight of the thirteen former colonies and established religions in at least four of the other five. [Footnote omitted]. But the successful Revolution against English political domination was shortly followed by intense opposition to the practice of establishing religion by law. This opposition crystallized rapidly into an effective political force in Virginia where the minority religious groups such as Presbyterians, Lutherans, Quakers and Baptists had gained such strength that the adherents to the established Episcopal Church were actually a minority themselves. In 1785–1786, those opposed to the established Church, led by James Madison and Thomas Jefferson, who, though themselves not members of any of these dissenting religious groups, opposed all religious establishments by law on grounds of principle, obtained the enactment of the famous 'Virginia Bill for Religious Liberty' by which all religious groups were placed on equal footing so far as the State was concerned.... By the time of the adoption of the Constitution, our history shows that there was a widespread awareness among many Americans of the dangers of a union of Church and State. These people knew, some of them from bitter personal experience, that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services. They knew the anguish, hardship and bitter strife that could come when zealous religious groups struggled with one another to obtain the Government's stamp of approval from each King, Queen, or Protector that came to temporary power. The Constitution was intended to avert a part of this danger by leaving the government of this country in the hands of the people rather than in the hands of any monarch. But this safeguard was not enough. Our Founders were no more willing to let the content of their prayers and their privilege of praying whenever they pleased be influenced by the ballot box than they were to let these vital matters of personal conscience depend upon the succession of monarchs. The First Amendment was added to the Constitution to stand as a guarantee that neither the power nor the prestige of the Federal Government would be used to control, support or influence the kinds of prayer the American people can say—that the people's religions must not be subjected to the pressures of government for change each time a new political administration is elected to office." 370 U.S. at 427–430, 82 S.Ct. at 1265–1267.

In *Jaffree v. Wallace,* 705 F.2d 1526 (11th Cir.1983), *appeal granted,* —— U.S. ——, 104 S.Ct. 1704, 80 L.Ed.2d 178 (1984), the Court is faced in part with determining the constitutionality of an Alabama law which provides:

> At the commencement of the first class of each day in all grades in all public schools, the teacher in charge of the room in which each such class is held may announce that a period of silence is not to exceed one minute in duration shall be observed for meditation or voluntary prayer, and during any such period no other activities shall be engaged in.

705 F.2d 1526, 1528, Ala.Code § 16–1–20.2. Cf. the West Virginia Constitutional provision at issue here quoted *supra* at n. 1.[4]

With respect to that provision, the Eleventh Circuit Court of Appeals opined:

> The objective of the meditation or prayer statute (Ala.Code § 16–1–20.1) was also the advancement of religion. This fact was recognized by the district court at the hearing on the motion for preliminary relief where it was established that the intent of the statute was to return prayer to the public schools.... The existence of this fact and the inclusion of prayer obviously involves the state in religious activities.... This demonstrates a lack of secular legislative purpose on the part of the Alabama Legislature. Additionally, the statute has the primary effect of advancing religion. We do not imply that simple meditation or silence is barred from the public schools; we hold that the state cannot participate in the advancement of religious activities through any guise, including teacher-led meditation.

705 F.2d 1526, 1536.

As stated in *Jaffree,* the test to be employed in ascertaining the constitutional validity of such provisions is well established. The Court must determine first, whether the statute has a secular purpose; second, whether its principal or primary effect either advances or inhibits religion,

and third, whether the provision fosters "an excessive government entanglement with religion." *Id.* at 1534, *citing, Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111–12, 29 L.Ed.2d 745 (1971); *Committee for Public Education and Religious Liberty v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973); *Walz v. Tax Commission,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970); *Murray v. Curlett,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); and, *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). See also, *Karen B. v. Treen,* 653 F.2d 897, 900 (5th Cir.1981), *aff'd,* 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982); and, *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980).

The test as enunciated above has been applied by a number of district courts to govern their deliberations on this issue. *See, Duffy v. Las Cruces Public Schools,* 557 F.Supp. 1013 (D.N.M.1983), and *May v. Cooperman,* 572 F.Supp. 1561 (D.N.J. 1983).

Defendants argue that the recent cases of *Lynch v. Donnelly,* —— U.S. ——, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) and *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) indicate that "the United States Supreme Court is in a state of flux with regard to the test applicable to Establishment Clause cases...."

This Court cannot agree and does not find the arguments advanced by Defendants persuasive. Accord, *May v. Cooperman,* 572 F.Supp. 1561, 1574 (D.N.J.1983): "[The Court's comments in *Marsh* ] suggest a clear intent to distinguish legislative prayer by adults which, like the opening of court, is primarily of a traditional ceremonial nature from mandated prayer by school children." This Court would further comment that such ceremony is meaningful but is participated in by consenting adults.

The authorities cited herein make it abundantly clear that if the law under scru-

---

**4.** West Virginia's provision under scrutiny here mandates ("*shall* provide") the activity provided

for, while the Alabama statute merely *permits* ("*may* announce") such activity.

tiny does not meet any of the three elements of the test set forth above, it must fail as violative of the "Establishment Clause."

■ The West Virginia provision fails to meet any of the three.

With respect to the first element, the legislative history of this particular provision reveals beyond doubt that its purpose was to return prayer to West Virginia's public schools. The Court has scrupulously reviewed all of the available evidence reflecting the legislative history and has concluded that no reasonable individual could reach a contrary conclusion. As one Senator stated during debate on the Amendment, "... you cannot do by indirection what you can't do directly." Another stated, "... it takes about 20 seconds to say the Lord's Prayer. Two minutes is just too long of a time to have kindergarten, middle school and type students stand in silence." One of the sponsors of the legislation has been publicly quoted as saying, "To me separation of church and state concept is a myth, like evolution."

During House debate, a Delegate quoted with approval from a constituent's letter: "I believe it is time when we should welcome God back into the classrooms and not by just meditation but by prayer and praise also." Numerous other similar comments are a major part of the legislative debate on the Amendment. No attempt was made to hide the clear intent of the legislation, namely that the State through its school system, would sponsor silent prayer.

The inclusion of the word "prayer" [5] is likewise indicative of the lack of a secular purpose, although at least one Court has held a similar statute unconstitutional even absent use of that term.[6]

The Court has determined that the provision here in issue fails to meet the first element of the test in that it clearly does not have a secular purpose, but instead has a religious purpose.

The only argument on this issue advanced by Defendants may be summarized as follows. Quoting a dissenting opinion in *Karen B. v. Treen*, 653 F.2d 897, 903, they argue, "§ 15-a has the primary purpose and effect of promoting not religion, but religious freedom. The promotion of religious freedom is a legitimate secular purpose, consonant with the purpose of the Free Exercise Clause of the First Amendment."

Again, the Court cannot find this argument persuasive, and inasmuch as Defendants cite no authority for this proposition, it is apparent that no other court has relied upon that rationale. As far as this Court can ascertain, the concept advanced is somewhat novel.

In any event, the Court considers the claim advanced by Defendants inherently contradictory and therefore it must be rejected.[7]

The Amendment must likewise fail when examined to determine if its "principal or primary effect either advances or inhibits religion."

---

5. "Prayer is perhaps the quintessential religious practice for many of the world's faiths, and it plays a significant role in the devotional lives of most religious people. Indeed, since prayer is a primary religious practice in itself, its observance in public school classrooms has, if anything, a more obviously religious purpose than merely displaying a copy of a religious text in a classroom." *Karen B. v. Treen*, 653 F.2d 897, 901, (5th Cir.1981), *aff'd*, 455 U.S. 913, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982). *See also, Duffy v. Las Cruces Public Schools*, 557 F.Supp. 1013 (D.N.M.1983).

6. *See, May v. Cooperman*, 572 F.Supp. 1561 (D.N.J.1983). The statute there declared unconstitutional provided, "1. Principals and teachers

in each public elementary and secondary school of each school district in this State shall permit students to observe a 1 minute period of silence to be used solely at the discretion of the individual student, before the opening exercises of each school day for quiet and private contemplation or introspection." *Id.* at 1562. New Jersey P.L.1982, Ch. 205.

7. Conspicuously absent from Defendants' argument in this regard is enunciation of the concept now advanced in the legislative history of this measure. A rationale developed long after passage of the Amendment in question but asserted in support of its "purpose" is entitled to little probative value.

The Court has concluded that on this issue, after examining the evidence adduced by Plaintiffs at the hearings conducted in this matter, that the rationale expressed by the Court in *May v. Cooperman*, 572 F.Supp. 1561 (D.N.J.1983) is supported by the facts in the case *sub judice*.

The *May* court stated:

I conclude that the Bill both advances and inhibits religion.

It advances the religion of some persons by mandating a period when all students and teachers must assume the traditional posture of prayer of some religious groups and during which those who pray in that manner can do so.

. . . . .

Thus the State has injected itself into religious matters by designating a time and place when children and teachers may pray if they do so in a particular manner and by mandating conduct by all other children and teachers so that the prayers may proceed uninterrupted in their presence.

While this form of legislation advances the religion of some, it inhibits the religion of others. . . .

First, there are those whose religious practices include silent prayer and meditation but who, as an article of faith, believe that the state should have no part in religious matters. For them, mandated prayer is no longer prayer. It is their conviction that if the State requires any form of religious observance the observance is drained of its substance, loses its power and becomes but an empty shell. . . .

Second, by mandating a minute of silence which permits some persons to engage in prayer, Bill 1064 prevents other persons from engaging in their kind of prayer. . . .

. . . .

[R]eligious practices and the concepts of ultimate reality to which these practices point vary ever more widely. While once the prayers of most religious people could be carried on in an environment of silence, now that is no longer the case.

The prayers of some persons require movement and sound. Bill 1064, therefore, mandates an environment which allows some to pray but which prevents others from engaging in their form of prayer.

Finally, there are those who profess no religion and to whom any form of prayer is offensive.

*Id.* at 1574, 1575.

The *May* court's rationale is compelling in the instant case and Plaintiffs' factual evidence obviously warrants adoption of that rationale by this Court.

Accordingly, the Court finds that the West Virginia provision fails to withstand scrutiny in that its primary effect both advances *and* inhibits religion.

With respect to the third prong of the test—excessive entanglement—the Court has concluded that the time, manner and place of the activity mandated by the Amendment are sufficient to warrant a finding of excessive entanglement.

As stated in *Duffy v. Las Cruces Pub. Schools*, 557 F.Supp. 1013 (D.N.M.1983),

The moment of silence is intended to provide a time, place and atmosphere for prayer. The time chosen is during school hours, and the place is the school grounds. The atmosphere of silence is instilled by the teachers. These facts alone have been found sufficient to constitute excessive entanglement. [Citations omitted].

In sum, the clear weight of authority supports this Court's view that the Amendment here challenged cannot withstand constitutional scrutiny and Plaintiffs are entitled to the relief they seek by virtue of the facts proved herein.

■ This Court cannot refrain from observing that in its opinion a hoax conceived in political expediency has been perpetrated upon those sincere citizens of West Virginia who voted for this amendment to the West Virginia Constitution in the belief that even if it violated the United States Constitution, "majority rule" would prevail.

There is no such provision in the Constitution.

The goals of the many citizens of West Virginia might have been far better served if the Amendment to the West Virginia Constitution had been realistically written within the guidelines of decisions of the Supreme Court of the United States. That Court has, in at least one instance, allowed a program in which students in public schools were released so they could receive religious training at other appropriate locations. *Zorach v. Clauson,* 343 U.S. 306, 772 S.Ct. 679, 96 L.Ed. 954 (1952). In *Zorach,* a majority of the Justices found that the early release of students so they could attend religious classes off school property was only accommodating the wishes of those who desired to be free of the state school system in order to receive religious education.

The Court anticipates continuing adverse reaction to its decision but considers its obligation to uphold the United States Constitution to be a duty which cannot in good conscience be shirked because of intimidation.

Finally, the Court observes that nothing in this Order prohibits or impedes the right of any West Virginia citizen, young or old, to pray in his or her own manner, any place, anytime. This Order only prohibits State sponsorship of such prayer.

### ORDER

Accordingly, it is hereby ORDERED that Plaintiffs' request for a declaratory judgment is GRANTED, and *W.Va. Const.* Art. III § 15–a is ADJUDGED and DECLARED violative of the First Amendment of the United States Constitution pursuant to 28 U.S.C. § 2201.

It is further ORDERED, by virtue of the provisions of 28 U.S.C. § 2202, that the Defendant class shall be ENJOINED and RESTRAINED from implementation of said Amendment both now and in the future. All members of the Defendant class, their officers, agents and employees, are ORDERED to comply with the terms of this Order immediately and are advised that failure to do so may result in their being held in contempt of this Court.

With respect to Plaintiffs' motion for an award of attorney's fees under the provisions of 42 U.S.C. § 1988, the Court shall withhold ruling on the propriety of such an award and ORDERS that Plaintiffs' counsel shall file a memorandum of law in support of said motion within 10 days of the date of this Order. Counsel for Defendants may file any desired response within 10 days thereafter, at which time the Court shall consider the matter mature for decision and may rule thereon without further notice to the parties. The Court shall retain jurisdiction over this matter until such time as resolution of the above motion has been reached.

The Clerk is directed to mail a certified copy of this Order to all counsel of record, and to each member of the Defendant class FORTHWITH.